**Tomas Marrero DIAZ, Plaintiff,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant.**

**Civ. No. 90–2133 GG.**

United States District Court, D. Puerto Rico.

April 21, 1992.

---

Juan A. Hernandez Rivera, Raymond Rivera Esteves, San Juan, P.R., for plaintiff.

Daniel F. Lopez Romo, U.S. Atty., Jose Vazquez Garcia, Asst. U.S. Atty., Hato Rey, P.R., for defendant.

## OPINION AND ORDER

GIERBOLINI, Chief Judge.

Plaintiff is seeking review of the Secretary of Health and Human Services's decision denying his application for disability benefits under the Social Security Act, 42 U.S.C. § 405(g). The Administrative Law Judge (hereafter ALJ) held a hearing, and thereafter affirmed the Social Security Administration's denial of plaintiff's claim. The Appeals Council denied plaintiff's request for review of the ALJ decision, mak-

ing the ALJ's decision the final decision of the Secretary.

We referred the case to the magistrate for a Report and Recommendation. The magistrate recommended that we affirm the decision of the Secretary on the basis that it was supported by substantial evidence, and that we deny plaintiff's claim for benefits. Upon our *de novo* review of the evidentiary record as a whole we find that the Secretary's findings of fact are not supported by substantial evidence. We thus REJECT the Report and Recommendation of the magistrate, since we find good cause to REMAND this case to the Secretary to take additional evidence on the points discussed below.

STANDARD OF REVIEW

The scope of judicial review by a district court of a final decision of the Secretary is limited by statute. 42 U.S.C. § 405(g) (1991) provides that, "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive ..." The Supreme Court has defined "substantial evidence" as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Accord Kent v. Schweiker*, 710 F.2d 110, 114 (3rd Cir.1983); and *Miranda v. Secretary of HEW*, 514 F.2d 996, 998 (1st Cir.1975).

Our Circuit has held that the "substantial evidence" standard is a "stringent limitation" on the scope of court review, *Reyes–Robles v. Finch*, 409 F.2d 84, 86 (1st Cir.1969); and that a district court should defer to the Secretary's "reasonable" findings of fact, even if a district court sitting as the trier of fact might have reached an opposite conclusion. *Lizotte v. Secretary of HHS*, 654 F.2d 127, 131 (1st Cir.1981), and *Velez v. Secretary of HEW*, 593 F.2d 157, 160, n. 4 (1st Cir.1979).

Despite the narrow scope of judicial review which governs a district court's review of the agency's final decision as to whether Social Security disability benefits should be granted, the Supreme Court has emphasized the importance of the judicial review process under a "substantial evidence" standard,

> Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the ... [agency] keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed on the record as a whole ...

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951); *See also Consolidated Edison Co.*, 59 S.Ct. at 217 ("[The] assurance of a desirable flexibility in administrative procedure does not go so far as to justify orders without a basis in evidence having rational probative force."); *Beavers v. Secretary of HEW*, 577 F.2d 383, 387 (6th Cir.1978); and *Klug v. Weinberger*, 514 F.2d 423, 425 (8th Cir.1975).

The Supreme Court has made clear, and other courts agree, that when reviewing a social security decision, a district court must look at the record as a whole to see if based on "substantial evidence".

> The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement ... that courts consider the whole record ... [A] reviewing court is not barred from setting aside a ... decision [of an agency] when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the ... [agency's] view.

*Universal Camera Corp. v. NLRB*, 71 S.Ct. at 464–465; *Kent*, 710 F.2d at 114. ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *Lynn v.*

*Schweiker,* 565 F.Supp. 265, 267 (S.D.Tex. 1983) ("However, it is not the Court's role on judicial review merely to rubber-stamp the decisions of the Secretary. It must scrutinize the record in its entirety to determine the reasonableness of the decision reached. *Simmons v. Harris,* 602 F.2d 1233, 1236 (5th Cir.1979)."); *Accord Simonson v. Schweiker,* 699 F.2d 426, 429 (8th Cir.1983); *Rodríguez v. Secretary of HHS,* 647 F.2d 218, 222 (1st Cir.1981); *Money v. Califano,* 470 F.Supp. 636, 640 (E.D.Ark.1979), and *Beavers,* 577 F.2d at 387.

## FACTUAL RECORD

After plaintiff's initial application for benefits was denied by the Secretary, administrative hearings were conducted on January 8, 1990 (Tr. 30–47), and February 8, 1990 (Tr. 48–76). Plaintiff was represented by counsel, and the ALJ took testimony. of plaintiff; a medical expert who surveyed the medical record without examining the plaintiff; and a vocational expert.

Plaintiff is a 56 year old married individual with one year of college whose past relevant work (PRW) was as a meter reader with an electric company for over twenty years (Tr. 35). This work consisted of walking, reading meters, standing, making notations of the numbers in a log book and driving a vehicle (Tr. 35).

Plaintiff claimed to have been unable to work since December of 1984. The ALJ found that the plaintiff met the Act's disability insured status requirements on the alleged date of onset, December 31, 1984, and continuously through December 31, 1990. (Tr. 12)

Plaintiff has a long history of mental impairments requiring psychiatric evaluation, as well as with other physical medical impairments. Plaintiff had a work accident in June of 1971 where a rock fell on his head, requiring stitches (Tr. 156). After this accident he developed persistent headaches. On December 21, 1971 Dr. Andrés López–Cumpiano diagnosed "anxious depression" and continued to treat claimant with medication and other treatment until May 7, 1979, when the doctor closed the case with a disability finding of Neurosis Class II with a 30% disability (Tr. 143, 156).

A March 26, 1980 evaluation by Dr. Guillermo Santiago, a psychiatrist, yielded a diagnosis of "depressive neurosis" (Tr. 147). Dr. Santiago found that plaintiff works in spite of his interpersonal relations and is at the "border of a psychotic outbreak." (Tr. 147, 148).

Dr. Abelardo Martinez did a psychiatric evaluation on May 1, 1981 and found that plaintiff has crying episodes, entertains ideas of low-self esteem, sadness and desperation, and that suicidal ideas and auditive hallucinations still persist. (Tr. 155). His conclusion was that the plaintiff was a "profoundly depressed person and with great irritability." (Tr. 157).

Plaintiff returned to the SIF on September 22, 1980 for psychiatric treatment, which continued through June 2, 1982. (Tr. 162). A September 10, 1982 psychiatric evaluation by Dr. Angel N. Miranda, found that plaintiff had sleeping problems and nightmares, episodes in which he forgets things, and frequent crying spells. (Tr. 176). Dr. Miranda diagnosed chronic depressive reaction—moderate—severe, and found symptoms of a slight conceptual disorganization, severe tension, severe depressive "mood", and hostile and severe-moderate motor retardation. (Tr. 177)

Dr. Abelardo Martínez did another psychiatric evaluation on November 8, 1982. Plaintiff complained that he doesn't go out alone because he becomes disoriented and does not know how to return home, cannot read because of severe headaches, and has frequent nightmares (bloody). (Tr. 167, 168) Plaintiff has mental blocks, and remembers dates and important events in his life, but forgets other details like the names of psychiatrists or prescriptions. (Tr. 168). Dr. Martinez diagnosed "neurosis of Anxiety with hysteric traits" and remarked that, "At present patient is working. He says that those 'mental blocks' prevents him from working efficiently. We recommend major psychiatric tx. to keep the patient in the work force." (Tr. 169)

Plaintiff was treated at SIF from May 21, 1987 to June 30, 1987 and the Final Report by Dr. Oscar Ruiz diagnosed Axis I—Dysthymic Disorder. (Tr. 172). The report notes ongoing dysphoric moods that include "depression, nervousness, forgetfulness irritability, anergia and insomnia of at least 2 years evolution", and Dr. Ruiz commented that intermittent long term psychiatric follow up would be required along with pharmacologic supervision and supportive psychotherapy. (Tr. 172). The last SIF progress notes of May 2, 1988 awarded plaintiff a 40% disability. (Tr. 174).

Dr. Reinaldo E. Kianes did a psychiatric evaluation on May 30, 1989 and diagnosed Adjustment Disorder with depressed mood. (Tr. 183) Dr. Kianes found that plaintiff can take care of his personal needs, watches T.V., sometimes listens to soft music, reads the newspaper, sometimes shops with wife, visits family, goes to church and sometimes drives. (Tr. 181). Dr. Kianes did not find blockings, suicidal ideas, delusions or perceptual disturbances. (Tr. 182). Dr. Kianes found claimant to be alert, in contact with reality, well oriented in the three spheres, able to do simple addition and subtraction, and able to handle funds.

Psychiatrist, Dr. Guillermo Santiago, again examined plaintiff on July 18, 1989. He noted that plaintiff still has crying spells. Plaintiff has a history of such spells, with the record showing "a long crying spell in front of all his workmates." (Tr. 185). Plaintiff still suffers from cervical pain, shoulder girdle tenderness, frequent occipital and frontal headaches; plaintiff "has taken every analgesic known without avail." (Tr. 185) Patient is insomniac, hardly sleeps, has no interests and no entertainments.

Dr. Santiago found that patient presented "mild to moderate psycho-motor retardation, looks apathetic, with sad facial expression," and expresses "ideas of worthlessness and invalidism ... Affect is depressed as is mood." (Tr. 186) Plaintiff is "repetitive, with occasional blocking ... Thought content is subjective, of somatizations, pessimistic and depressive ideas ...

The patient is well oriented in person and in place but not in time. His attention and concentration ... insight, judgment, intellectual functions ... are impaired." (Tr. 186–187)

Dr. Santiago diagnosed plaintiff as suffering from "Dysthymia, severe, secondary, late onset," and concluded that, "At the present time because of his poor interpersonal relations his conflict with authority, his psychomotor retardation and crying spells, his pesimism [sic] and poor judgement, the patient is unable to hold a *steady* remmuneration [sic] job. He requires treatment and medication." (Tr. 187)

Plaintiff underwent psychological examinations and psychological testing with Dr. Luis R. Ríos–García, Ph.D., on October 26, 1989 and November 6, 1989. Dr. Ríos–García used the following instruments of assessment: a clinical interview; Wechsler Adult Intelligence Scale (WAIS); Bender Gestalt Test; Bender–Memory; Sentence Completion Test; and the MMPI–Mini Mult. Plaintiff reported that he was under psychiatric care again at the time of the visits. (Tr. 226). Dr. Ríos–García observed that plaintiff seemed tense, reserved, fearful, but was cooperative, "Furthermore, his behavior during the evaluation session may be described as confused ... he was clinically depressed during much of the time, as evidenced by a sad facial expression and tearfulness." (Tr. 227)

Dr. Ríos–García found that plaintiff has a full scale I.Q. of 63, and that intellectually, plaintiff is presently functioning at the "Mental Deficiency level." (Tr. 227) Dr. Ríos–García found that in the verbal area plaintiff showed significant limitations in his "short term memory, attention, and alertness. He also shows poor judgement, limited concentration and difficulties in handling abstractions." (Tr. 228)

The test data revealed significant nonverbal impairment also, since plaintiff is "not able to learn a new, time-limited task, cannot handle a task requiring logical planning abilities, and has difficult visual-motor coordination. These findings point toward consistent evidence of intellectual deterio-

ration." (Tr. 228) Dr. Ríos–García described plaintiff emotionally as an "empty, depressed, insecure person who feels alienated from his sorroundings, [sic] on the basis of existing evidence. At present his self-perception is negative, and his attitude toward the environment can be described as very pessimistic ... He is chronically sad and tense, with very little sense of control over his life." (Tr. 228)

Dr. Ríos–García concluded his diagnosis by stating that plaintiff is a "54 year-old man whose psychological functioning at this time appears to have deteriorated significantly. Test findings point toward a severe depression, which significantly interferes with his ability to function independently and work. His condition is now chronic and he needs psychiatric intervention to be able to maintain his present functioning." (Tr. 228)

Dr. Guillermo Santiago evaluated plaintiff again on November 8, 1989 and specifically noted that plaintiff's response to treatment had been poor, patient's condition "today worse than in 7–89." (Tr. 229) Dr. Santiago describes plaintiff as forgetting everything, always irritable, nothing interests him, doesn't watch TV or read papers, depressed, indifferent, daily activities are nil, socially ineffective, and no friends. (Tr. 229) Plaintiff was diagnosed with dysthymia, secondary, late onset, and psychomotor retardation. (Tr. 229)

Dr. Santiago described plaintiff's mood as "obviously depressed & cryfull" [sic]; described plaintiff's attention and concentration, insight and judgment, immediate recollection and learning, and ability to perform calculations, all as being poor; and also found that patient is "disoriented in time." (Tr. 230) Plaintiff has to be reminded to change and shower during the day and never goes out alone. (Tr. 231).

Dr. Santiago found plaintiff to be a suicidal risk and prescribed medication for his suicidal tendencies; plaintiff "thinks of jumping from a high bldg, but shooting himself at the same time to make sure he dies." (Tr. 232)

Dr. Santiago concludes that plaintiff is unable to hold a steady remunerative job, can not follow simple instructions, does not tolerate criticism, and can not perform simple and repetitive tasks because too slow and irritable. (Tr. 232).

## LEGAL ANALYSIS

The Secretary has adopted a five-step sequential analysis to determine if claimants are "disabled" under the act. Using the Secretary's five-step sequential analysis for evaluation of whether a claimant is disabled, *See Bowen v. Yuckert*, 482 U.S. 137, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987); and *McDonald v. Secretary of HHS*, 795 F.2d 1118, 1120 (1st Cir.1986); the ALJ found at Step 1 that claimant had not engaged in "substantial gainful activity" since December 31, 1990, so the ALJ appropriately went on to Step 2.

At Step 2 the ALJ must determine whether the claimant has a "medically severe impairment or combination of impairments." *Id.* If a claimant does not have a severe impairment or combination of impairments, then the disability claim is denied. *Id.* This determination is governed by a "severity regulation" which states: "If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled." 20 C.F.R. § 404.1520(c), *quoted in Yuckert*, 107 S.Ct. at 2291.

After briefly summarizing the medical record, (Tr. 12–15), the ALJ found that the "claimant has an emotional impairment which is of significant nature. Therefore, the claimant has a severe impairment." (Tr. 15). Since the ALJ found that plaintiff had a severe impairment, he properly went on to Step 3 of the sequential analysis. *Id.*

At Step 3 the ALJ must determine if the impairment meets or equals one of the listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity. If the impairment meets or equals a listed impairment, the claimant is conclusively presumed disabled; if not, the evaluation proceeds to Step 4 to determine whether the impair-

ment prevents the claimant from performing his past relevant work. *Id., See* 20 C.F.R. pt. 404, Subpt. P, App. 1. The ALJ found that claimant had a "severe dysthymic disorder and adjustment disorder, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4." ALJ Finding 3, (Tr. 17). Since the ALJ found that plaintiff's mental condition did not meet or equal the degree or severity of the Listing of Impairments, the ALJ went on to Step 4. (Tr. 15)

At Step 4 the ALJ found that the plaintiff could still do his PRW as a meter reader. The ALJ stated that based on his assessment of the residual functional capacity of the claimant, and the hypothetical questions that he posed to the vocational expert, he agreed with the testimony of the vocational expert, "that the claimant can perform his past relevant work." (Tr. 16). Once the ALJ made a finding that the claimant could do his past relevant work, the claimant was found to be not disabled under the Act, and the sequential analysis stopped at Step 4. (Tr. 16–17)

If the claimant had been found not able to do his past relevant work, then the ALJ would have had to go on to Step 5 where the Secretary would have the burden of proof of showing that the claimant is able to perform work available in the national economy in view of his age, education, and work experience. *Id,* 107 S.Ct. at 2294, n. 5. Claimant is entitled to disability benefits only if he is not able to perform other work. *Id.*

■ We find several errors in the ALJ's analysis serious enough to require a remand for the taking of additional evidence. The ALJ asserts in Finding # 3 that, "The medical evidence establishes that the claimant has severe dysthymic disorder and adjustment disorder, but that he does not have an impairment or *combination* of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4." (Tr. 17) (emphasis added). This finding is not supported by substantial evidence because nowhere in the decision

of the ALJ, does the ALJ show where he analyzed plaintiff's ailments in combination. The Social Security Disability Benefits Reform Act of 1984, specifically provides in §§ 4(a)(1) and (b), that impairments not be evaluated solely in isolation.

> In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Secretary shall consider the combined effect of all the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. If the Secretary does find a medically severe combination of impairments, the combined effect of the impairments shall be considered throughout the disability determination process.

42 U.S.C. §§ 423(d)(2)(C), *quoted* in *Yuckert,* 107 S.Ct. at 2296.

This amendment was drafted to explicitly reverse the Secretary's prior policy of refusing to consider the combined effects of unrelated impairments at the severity stage of the sequential evaluation process unless all of claimant's impairments were classified as severe. *McDonald,* 795 F.2d at 1126; *see also Reyes v. Secretary of HEW,* [Jan. 1976—Jan. 1977 Transfer Binder] Unempl.Ins.Rep. (CCH) ¶ 14,803 (D.P.R. 1976); and *Camp v. Schweiker,* 643 F.2d 1325, 1333 (8th Cir.1981).

■ The ALJ noted that the medical record showed that plaintiff was diagnosed with chronic back spasms, and chronic fibromyositis moderately severe, and that the patient was taking medication for pain and anti-inflammatories. (Tr. 14) The ALJ also noted the subjective allegations of pain plaintiff testified to at the hearing, but concluded that nothing in the file indicated a "significant impairment" preventing the claimant from performing basic work activities. The ALJ also stated that, "An allegation of pain has to be supported by objective clinical findings." (Tr. 15) It is unclear from this statement whether the ALJ applied an erroneous legal standard when evaluating plaintiff's subjective allegations

of pain. *Da Rosa v. Secretary of HHS,* 803 F.2d 24, 26 (1st Cir.1986). The First Circuit has made clear that while the Act requires some objective documentation of the probable cause of pain, it does not require objective documentation of its intensity, since an ALJ " 'must be aware that symptoms, such as pain, can result in greater severity of impairment than may be clearly demonstrated by the objective physical manifestations of a disorder.' " *Avery v. Secretary of HHS,* 797 F.2d 19 (1st Cir.1986); *quoting* HHS's Program Operations Manual System (POMS), DI T00401.570; *see also Simonson v. Schweiker,* 699 F.2d 426, 429 (8th Cir.1983); and *Miranda,* 514 F.2d at 999–1000.

The ALJ found that claimant had an emotional impairment of a significant nature, i.e. a severe impairment. (Tr. 15) He then noted that the next sequential step was to determine whether the claimant's "physical and emotional impairments meet or equal the degree of severity defined in the Listing of Impairments." (Tr. 15) The ALJ stated that he agreed with the testimony of the medical expert at the hearing to the effect that "claimant's *mental* condition did not meet or equal the severity of the Listing of Impairments." (Tr. 15) (emphasis added) The rest of the ALJ's opinion merely summarizes his conclusions as to plaintiff's mental impairments with no further mention of physical impairments. Since it is unclear whether the ALJ properly evaluated plaintiff's subjective complaints of pain, and it is clear that he did not consider the severity of the emotional and physical impairments in combination, the ALJ's finding # 3 is not supported by substantial evidence. *See also De Paepe v. Richardson,* 464 F.2d 92, 94, 99–100 (5th Cir.1972); and *Phillips v. Harris,* 488 F.Supp. 1161, 1166 (W.D.Va.1980).

■ The ALJ's finding that claimant's mental impairment was not severe enough to be presumed disabling at Step 3 is also questionable, since the ALJ completely ignored certain medical evidence in the record, which would suggest a result contrary to his finding. It is clear that for a finding to constitute substantial evidence,

the ALJ "must take into account whatever in the record fairly detracts from its weight." *Universal Camera,* 71 S.Ct. at 464.

One example where the ALJ totally ignored contrary evidence is on the issue of suicide. The ALJ casually dismissed claimant's testimony at the hearing regarding suicidal tendencies, (Tr. 43), with a reference to a psychiatric examination by Dr. Kianes which had found no suicidal ideas. (Tr. 182) There is no further mention of suicide anywhere in the ALJ's decision. Yet there are other references to plaintiff's suicidal tendencies in the medical record as far back as Dr. Martínez' psychiatric evaluation on May 1, 1981. (Tr. 155) In Dr. Santiago's evaluation of November 18, 1989, he noted that plaintiff thinks of jumping off a building while shooting himself at the same time, to ensure that he dies. (Tr. 232) Dr. Santiago found claimant to be a suicidal risk and prescribed medication for treatment. (Tr. 229, 232)

■ Under the act the Secretary is given the chief responsibility for weighing credibility, resolving evidentiary conflicts, drawing "permissible inference" from the evidentiary record, and determining the question of disability. *Rodriguez,* 647 F.2d at 222; and *Miranda,* 514 F.2d at 998. While the ALJ is free to make a finding which gives less credence to certain evidence, he cannot simply ignore, as he did here, the "body of evidence opposed to the ... [ALJ's] view." *Universal Camera,* 71 S.Ct. at 465.

■ The ALJ reached his conclusion at Step 3, that plaintiff's severe mental impairment did not meet or equal the degree of severity required in the Listing of Impairments, by discrediting the testimony of two examining psychiatrists, Dr. Santiago and Dr. Ríos–García. Dr. Santiago saw claimant on at least four separate occasions over a 9–year period (Tr. 142–152, 184–187, and 229–232), and he specifically noted in his last evaluation of plaintiff on November 8, 1989 that plaintiff's condition was poor, worse than it had been in Santiago's prior evaluation of him in July of 1989. (Tr. 229) Dr. Santiago also found in the November

1989 visit that plaintiff posed a risk of suicide which required medication.

Dr. Santiago had concluded in his July 18, 1989 evaluation that the severity of plaintiff's emotional impairments at that time were such that plaintiff would be unable to hold down a steady remunerative job. (Tr. 187) The ALJ attempted to discredit Dr. Santiago's evaluation by saying it was inconsistent with the evaluation of Dr. Kianes two months earlier, who did not find that plaintiff had such a severe emotional impairment. (Tr. 14) The failure of the ALJ to even address the November 1989 evaluation of Dr. Santiago, and Dr. Santiago's description of a worsening emotional impairment, means that the ALJ's finding at Step 3, that plaintiff's mental impairment was not severe enough to be "disabling," is not supported by substantial evidence.

We need no additional reason to remand, but we also have questions regarding the ALJ's discrediting of Dr. Ríos–García's psychiatric evaluation. Dr. Ríos–García did a psychological evaluation of plaintiff, based on plaintiff's two separate visits in October and November of 1989, during the same general time frame when Dr. Santiago observed a decline in plaintiff's mental functioning. (Tr. 226–228) Dr. Ríos–García found, after conducting a battery of evaluative tests and a clinical interview, that plaintiff's full scale IQ was 63, which would mean plaintiff was functioning at a mentally deficient level, such as to meet the degree of severity in the Listing of Impairments. (Tr. 227) Dr. Ríos–García also noted that his findings pointed towards "consistent evidence of intellectual deterioration," and a "severe depression, which significantly interferes with his [plaintiff's] ability to function independently and work." (Tr. 228)

■ The ALJ discredited Dr. Ríos–García's conclusion that plaintiff was mentally retarded, and at one point the ALJ stated, that from the ALJ's observation of plaintiff at hearing, "He [plaintiff] did not impress as being a mental retarded person." (Tr. 16) Since the ALJ, a lay person, based his conclusion that plaintiff was not mentally retarded at least in part on his personal observation, it appears that the ALJ went beyond his authority when he reached this conclusion. *Miranda,* 514 F.2d at 999; *see also Kent* 710 F.2d at 115 (ALJ's conclusion, based on his own medical judgment not permitted to stand since this type of judgment is not within ambit of ALJ's expertise); *Helms v. Califano,* 473 F.Supp. 1329, 1334 (W.D.N.C.1979). (ALJ does not have authority to base ruling on his own medical opinion, when not qualified on the record as a medical expert).

The ALJ also stated that there was no evidence in the file to support a conclusion of mental retardation. (Tr. 15) This statement is simply erroneous, since the evaluation by Dr. Ríos–García clearly constitutes medical evidence, being based on personal examination of claimant on two occasions, clinical testing and interviews. (Tr. 226) There is no contrary clinical medical evidence in the record to rebut Dr. Ríos–García's conclusion of mental retardation. The only other item in the record which might be classified as "medical evidence," contrary to Dr. Ríos–García's conclusion of mental retardation, is the testimony of the medical expert, Dr. Rafael Nogueras, who never personally examined plaintiff. Dr. Nogueras discredits Dr. Ríos–García's conclusion of mental retardation since Dr. Nogueras states that this is inconsistent with someone who completed one year of college, and that plaintiff's low IQ grading must have been the result of plaintiff's confusion with the testing instructions. (Tr. 63–64)

■ This court notes that it does not logically follow that just because plaintiff completed one year of college at some point in his life, that clinical testing over twenty years later can not validly find plaintiff to currently function at a level of mental retardation. Normally a psychiatrist who actually conducted clinical testing, would be better able to determine the level of difficulty plaintiff was having comprehending test instructions and adjust accordingly for that factor; than would another psychiatrist evaluating only the written record of such testing. We think the factual record

**914**

was insufficient to support the ALJ's analysis on this point, since there was no other clinical IQ testing in the record other than Dr. Ríos–García's, and certainly no contrary clinical data. Since we find other grounds sufficient for remand, we need not resolve this issue.

The ALJ also found that "claimant's impairments do not prevent the claimant from performing his past relevant work." Finding # 7 (Tr. 17) With this finding, the ALJ ended the sequential evaluative process at Step 4, with a conclusion that claimant was not disabled and thus not entitled to benefits. The ALJ stated, that the vocational expert testified that claimant could do his past relevant work, and that the ALJ agreed with this determination of the vocational expert. (Tr. 16) The testimony of the vocational expert was not as conclusive on the issue of whether plaintiff could perform his past relevant work, as the language of the ALJ's opinion indicates.

The vocational expert Dr. Héctor Puig responded to seven hypothetical questions posed by the ALJ to him. (Tr. 69–76) Dr. Puig responded to four of the hypotheticals, hypotheticals 2, 3, 5, and 7, by stating that if you credited either Dr. Ríos–García's finding that plaintiff was functioning at a mentally deficient level (Hypo 2); Dr. Santiago's psychiatric evaluations of plaintiff's mental impairment (Hypo 3); plaintiff's subjective complaints of physical pain at the hearings (Hypo 5); or else plaintiff's subjective complaints of physical and mental impairments (Hypo 7); the medical evidence would indicate that plaintiff would be unable to perform his past relevant work, or any other job. (Tr. 72–76) Dr. Puig found that, on the other hand, if you credited the testimony of the medical expert, Dr. Nogueras (Hypo 1); the psychiatric evaluation of Dr. Kianes (Hypo 4); or else discredited plaintiff's subjective claims of pain (Hypo 6); then plaintiff would be able to do his past relevant work, and is not disabled. (Tr. 71, 72, 74–74) Since we have found above that some of the findings and analysis of the ALJ are not supported by substantial evidence, it is unclear whether substantial evidence supports the ALJ's

Finding 7, that plaintiff can do his past relevant work.

We thus find good cause to REMAND under 42 U.S.C. § 405(g), and hereby ORDER that this case BE REMANDED to the Secretary for further proceedings consistent with this Opinion and Order, and for the taking of additional medical evidence. *See Evangelista v. Secretary of HHS*, 826 F.2d 136, 139–140 (1st Cir.1987); *Falú v. Secretary of HHS*, 703 F.2d 24, 26–27 (1st Cir.1983); *Deblois v. Secretary of HHS*, 686 F.2d 76, 77–81 (1st Cir.1982); and *Currier v. Secretary of HEW*, 612 F.2d 594, 597–598 (1st Cir.1980).

SO ORDERED.